IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | Case No. 2:24-cv-00918-RJS-DBP |
| v. | Chief District Judge Robert J. Shelby |
| JOHN S. CLAYTON, et al., | Chief Magistrate Judge Dustin B. Pead |
| Defendants. | |

Now before the court is Defendant Standard Registrar & Transfer Co., Inc.'s (Standard Registrar) Rule 12(b)(6) Motion to Dismiss.[1]  For the reasons explained below, the court DENIES the Motion.[2]

## BACKGROUND[3]

This case concerns Defendant John Clayton's alleged securities fraud scheme to "secretly amass and then illegally sell stock of small, publicly traded companies."[4]  Standard Registrar is an SEC-registered transfer agent owned by Clayton.[5]  A "transfer agent" is a company that "issues and cancels certificates of a company's stock to reflect changes in ownership."[6]  Transfer

---

[1] Dkt. 43, *Motion to Dismiss Claims Three and Four as against Defendant Standard Registrar & Transfer Co., Inc* (*Motion*).

[2] Pursuant to DUCivR 7-1(g), the court finds oral argument is not necessary and decides the Motion on the papers.

[3] The court takes the following facts from Plaintiff Securities and Exchange Commission's Complaint.  Dkt. 1, *Complaint*.  At the motion to dismiss stage, the court accepts as true SEC's well-pleaded factual allegations and views them in the light most favorable to the SEC.  *See, e.g.*, *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005) (citation omitted).

[4] *Complaint* ¶ 1.

[5] *Id*. ¶ 19.

[6] *Id*. ¶ 44.

agents "also track whether shares are restricted from resale."[7]  Companies that own publicly traded stock often "use transfer agents to keep track of the individuals and entities that own their stock."[8]

Section 4(a)(1) of the 1933 Securities Act (the '33 Act) exempts "transactions by any person other than an issuer, underwriter, or dealer" from traditional registration requirements under federal securities law.[9]  Relevant here, "Rule 144 under the Securities Act [17 C.F.R. § 240.144] provides a set of conditions, commonly referred to as a safe harbor, for a seller of stock to avoid" being classified as an underwriter.[10]  But even when sellers avoid such classification, "the Rule 144 safe harbor limits the amount of stock that an affiliate can publicly sell in an unregistered transaction."[11]  An "affiliate" in this context "is a person or entity . . . that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with" a stock issuer.[12]

Transfer agents "often require an attorney opinion letter stating that the requirements of Rule 144 have been met, including representations about whether the stockholder is an affiliate, before removing restrictive legends from stock on the basis of the Rule 144 safe harbor."[13]  Defendant Daniel W. Jackson is an attorney who served on Standard Registrar's board of directors.[14]  Jackson allegedly falsely opined in several letters that Standard Registrar was

---

[7] *Id.*

[8] *Id.*

[9] *Id.* ¶ 45.

[10] *Id.* ¶ 45.

[11] *Id.* ¶ 46.

[12] *Id.* ¶ 43.

[13] *Id.* ¶ 47.

[14] *Id.* ¶ 20.

permitted to remove restrictive legends on stock owned by business entities controlled by

Clayton (the Clayton Nominees), and that the Clayton Nominees were not "affiliate[s]" of the

issuer.[15]  The Clayton Nominees are named in this lawsuit as "Relief Defendants."[16]

Relevant here, Clayton's scheme involved stock ownership in microcap companies,

which include companies with stock that trades at less than $5.00 per share.[17]  These stocks are

commonly referred to as "penny stocks."[18]  Clayton acquired significant stock holdings in four

microcap companies—Flexpoint Sensor Systems, Inc. (Flexpoint), ForeverGreen Worldwide

Corp. (ForeverGreen), KwikClick, Inc., and LZG International, Inc. (together, the Clayton

Issuers)—and he hid these holdings by acquiring stock in the name of one or more of the Clayton

Nominees.[19]  Clayton was an affiliate of each of the Clayton Issuers.[20]

From at least 2014 to 2024, Clayton—using Standard Registrar and aided by Jackson,

among others—"repeatedly undertook a scheme to fraudulently sell Flexpoint stock to the public

in an artificially inflated securities market."[21]  Specifically, in 2019, Standard Registrar allegedly

removed restrictive legends for 6.85 million shares of Flexpoint stock owned by two Clayton

Nominees relying on attorney opinion letters written by Jackson, who was also a Standard

Registrar board member.[22]  The stock was then deposited with a brokerage firm and then

Clayton, with the help of other co-Defendants, artificially inflated Flexpoint's price through

---

[15] *Id.* ¶¶ 48–49.

[16] *Id.* ¶ 1.

[17] *Id.* ¶ 34.

[18] *Id.*

[19] *Id.* ¶ 51.

[20] *Id.* ¶ 43.

[21] *Id.* ¶ 76.

[22] *Id.* ¶ 82.

coordinating the release of positive news.[23]  Clayton Nominees then sold the stock to the public

in unregistered transactions exceeding Rule 144's volume restrictions.[24]  Clayton, using Standard

Registrar, repeated the Flexpoint scheme again in 2021, culminating in the sale of over 15

million shares of Flexpoint stock held by Clayton Nominees in unregistered transactions

exceeding Rule 144's volume restrictions.[25]  Clayton, using Standard Registrar, repeated a

similar process with ForeverGreen, causing the sale of over 2 million shares of ForeverGreen

stock since 2012.[26]

With respect to the two other microcap companies alleged to have been involved in

Clayton's fraudulent transactions—KwikClick and LZG International—Standard Registrar is not

specifically alleged to have improperly removed any restrictive legends in advance of any

completed sales to the public.[27]  However, the SEC alleges Jackson "provided attorney opinion

letters to assist" in the sale of LZG International stock, and that Jackson responded to a

regulatory inquiry "concerning promotion and sale of KwikClick stock."[28]

The SEC brings three claims against Standard Registrar: (1) fraud in the offer or sale of

securities under Sections 17(a)(1) and (3) of the Securities Act;[29] (2) fraud in connection with the

purchase or sale of securities under Section 10(b) of the Exchange Act and Rules 10b-5(a) and

---

[23] *Id*. ¶¶ 84–87.

[24] *Id*. ¶ 87.

[25] *Id*. ¶¶ 88–99.

[26] *Id*. ¶¶ 100–05.

[27] *Id*. ¶¶ 106–16.

[28] *Id*. ¶¶ 108, 114–15.

[29] *Id*. ¶¶ 146–48.

(c) thereunder;[30] and (3) unregistered offerings of securities under Section 5(a) and (c) of the Securities Act.[31]

Now before the court is Standard Registrar's partial Rule 12(b)(6) Motion to Dismiss the SEC's two fraud claims under Sections 17(a) and 10(b).  The Motion is fully briefed and ripe for decision.[32]

## LEGAL STANDARD

A motion to dismiss for failure to state a claim tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true.[33]  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[34]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[35]  This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[36]  A complaint need not set forth detailed factual allegations, yet "[a] pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action'" is insufficient.[37]

---

[30] *Id.* ¶¶ 149–51.

[31] *Id.* ¶¶ 155–57.

[32] *Motion*; Dkt. 62, *Plaintiff Securities and Exchange Commission's Opposition to Standard Registrar and Transfer Co. Inc.'s Motion to Dismiss Claims Three and Four of the Complaint* (*Opposition*); Dkt. 67, *Reply in Support of Defendant Standard Registrar's Motion to Dismiss Claims Three and Four* (*Reply*).

[33] Fed. R. Civ. P. 12(b)(6); *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994) (citing *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991)).

[34] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[35] *Iqbal*, 556 U.S. at 678.

[36] *Id.* at 679.

[37] *Id.* at 678 (quoting *Bell Atl. Corp.*, 550 U.S. at 555).

## ANALYSIS

Standard Registrar primarily makes two arguments in support of its Motion to Dismiss. First, it contends that "intermediaries" who are not "primary actors" in the sale of stock cannot be sued for fraud under Sections 17(a)(1) and (3) of the Securities Act.[38]  Because Standard Registrar is only a transfer agent that was not directly involved in the "offer" or "sale" of securities, Standard Registrar believes it is immune from the antifraud provisions in Sections 17(a)(1) and (3).[39]  Second, it contends Clayton's mental state (whether he acted with scienter or negligence) cannot be imputed to Standard Registrar.[40]

The court is unconvinced.  Many courts that have opined on whether Sections 17(a)(1) and (3) reach parties beyond those directly involved in the selling of securities have concluded they do.  Furthermore, the SEC adequately alleges Clayton owns Standard Registrar and used it to further his scheme such that this court can fairly impute his mental state to the company at this stage.

**I.      Sections 17(a)(1) and (3) of the Securities Act Apply to Standard Registrar on These Facts.**

The SEC brings a single claim against Standard Registrar for fraud in the offer or sale of securities under Sections 17(a)(1) and (3) of the Securities Act.  Section 17(a) provides:

> (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly-
>
> > (1) to employ any device, scheme, or artifice to defraud, or
>
> > (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to

---

[38] *Reply* at 3–4; *see also Motion* at 6–9.

[39] *Motion* at 6–9.

[40] *Id.* at 9–17.

> make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> > (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Standard Registrar emphasizes that Section 17(a) applies to "any person in the offer or sale of any securities," whereas Section 10(b) of the Exchange Act and Rules 10b-5(a) apply to persons engaged in conduct "in connection with the purchase or sale of securities."[41]  According to Standard Registrar, the narrower language in Section 17(a) "targets or proscribes the conduct of those initially offering securities for sale," which is consistent with Standard Registrar's view that the purpose of the '33 Act was to regulate the offering of securities between people in privity of contract and not the subsequent trading thereof.[42]  Thus, Standard Registrar contends holding transfer agents like itself responsible under Section 17(a) is contrary to the statutory language and purpose of the '33 Act.[43]

The SEC, on the other hand, rejects Standard Registrar's view of Section 17(a).  The Commission contends Standard Registrar "latches onto small statutory differences" in the antifraud provisions of the federal securities law and "cites no cases to support" its reading of Section 17(a).[44]  The SEC and Standard Registrar appear to agree that whether Section 17(a) reaches the conduct of intermediaries like transfer agents is an unsettled question of law, at least within the Tenth Circuit.[45]  However, the SEC contends the "Supreme Court and every circuit

---

[41] *Id*. at 6–8.

[42] *Id*. at 7.

[43] *Id*. at 6–9.

[44] *Opposition* at 6.

[45] *Id*. at 7; *Reply* at 3.

court that has approached the issue has indicated that there is no difference between the reach of Section 10(b) and Section 17(a)."[46]

The court agrees with the SEC. The Commission provides a robust and convincing set of authorities articulating that Standard Registrar's role in the securities-selling process falls within the scope of Section 17(a), whereas the cases cited by Standard Registrar do not support its position.

The major Supreme Court decision interpreting Section 17(a) of the Securities Act is *United States v. Naftalin*.[47] There, a defendant-investor falsely represented to brokerage firms that he owned stock that he directed the firms to sell.[48] The defendant argued that Section 17(a) applies only to fraud directed against investors, not brokerage firms.[49] The Supreme Court disagreed, determining that Section 17(a)(1) prohibits frauds against brokerage firms because the investor's conduct "clearly" occurred in the context of "[a]n offer and sale."[50] The Court opined that "Congress expressly intended to define broadly" Section 17(a),[51] such that the provision would "cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading."[52]

Relying on *Naftalin*, courts, albeit in unpublished decisions, have held that 1) a defendant-attorney who disseminated false statements to transfer agents, and 2) an issuer of mortgage-backed securities who lied on a government application for guarantees relating to the

---

[46] *Opposition* at 7.

[47] 441 U.S. 768 (1979).

[48] *Id*. at 770.

[49] *Id*. at 772–73.

[50] *Id*.

[51] *Id*. at 773 (citing legislative history).

[52] *Id*. at 778 (citations omitted).

securities, can both be held liable under Section 17(a).[53]  In neither instance did the defendants'

fraud directly target particular investors, but the courts determined that their fraud sufficiently

targeted intermediaries involved in the buying and selling process such that they could be held

liable under Section 17(a).[54]  This is consistent with how courts consistently find no meaningful

difference between the elements of claims under Section 17(a) and 10(b) despite minor

differences in statutory language.[55]  And while the Tenth Circuit has not explicitly decided

whether Section 17(a) applies to transfer agents like Standard Registrar, in *SEC v. Wolfson*, the

Circuit cited favorably to *Naftalin* and in dicta rejected the notion that Section 17(a) limits

liability to only "literal buyers and sellers of security."[56]

Standard Registrar quotes from several cases purporting to highlight distinctions between

Section 17(a) and Section 10(b), but none of these cases foreclose Section 17(a) liability for

intermediaries like Standard Registrar.  Standard Registrar relies on *Aaron v. SEC*,[57] which it

claims to be the leading case on Section 17(a),[58] to emphasize that the statute only applies to

sellers of securities.[59]  But this is the same case the defendant in *Wolfson* relied on to argue the

same proposition, which the Tenth Circuit expressly rejected.[60]  The other cases Standard

---

[53] *SEC. v. Czarnik*, No. 10-cv-745-PKC, 2010 WL 4860678, *3–5 (S.D.N.Y. Nov. 29, 2010) (unpublished) and *SEC v. Radius Cap. Corp.*, 653 F. App'x 744, 749–51 (11th Cir. 2016) (unpublished).

[54] *Id*.

[55] *See*, *e.g.*, *SEC v. Intelliquis Int'l, Inc.*, No. 2-cv-674-PGC, 2003 WL 23356426, at *9 (D. Utah Dec. 11, 2003) (unpublished) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996)); *SEC v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) ("The elements of a claim under § 17(a) of the Securities Act, which prohibits fraud in the 'offer or sale' of a security . . ., are '[e]ssentially the same' as the elements of claims under § 10(b) and Rule 10b-5." (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999))).

[56] *SEC v. Wolfson*, 539 F.3d 1249, 1263 n.20 (10th Cir. 2008).

[57] 446 U.S. 680 (1980).

[58] *Motion* at 7–8.

[59] *Id*.

[60] *Wolfson*, 539 F.3d at 1263 n.20.

Registrar relies on simply quote from the relevant antifraud provisions in the statutes; they do not suggest that transfer agents like Standard Registrar cannot be liable under Section 17(a), nor do they hold that Sections 10(b) and 17(a) have meaningfully different scopes.[61]

In Reply, Standard Registrar appears to concede that some transfer agents can be held liable for fraud under Section 17(a).[62]  However, it asserts that courts must determine this on a "case-by-case" basis and that, here, Standard Registrar is an improper defendant because it "merely transferred stock or issued stock on the exercise of convertible notes pursuant to ordinary instructions."[63]  It further argues that a stock transfer agent like itself could be held liable under Section 17(a) only "if it actively participated in fraudulent conduct tied directly to the offer or sale of securities."[64]

Whether Standard Registrar can be adequately charged with Clayton's alleged fraud is a question concerning whether it can be appropriately imputed with his mental state—not a question of whether Section 17(a) encompasses Standard Registrar's role in the securities-selling process.  Nowhere does Standard Registrar contend that Clayton's conduct is insufficiently tied to the "offer" or "sale" of securities under 17(a), yet the basis of the SEC's fraud claims against Standard Registrar is Clayton's ownership and control over it and his use of Standard Registrar in his scheme.[65]

---

[61] *Motion* at 8 (citing *Malouf v. SEC*, 933 F.3d 1248, at 1263 n.14 (10th Cir. 2019), *Buford White Lumber Co. Profit Sharing & Savings Plan & Trust v. Octagon Properties, Ltd.*, 740 F. Supp. 1553, 1568–69 (W.D. Okla. 1989), and *SEC v. Goldstone*, 2015 WL 5138242, at *202 (D.N.M. 2015)).

[62] *See generally*, *Reply*.

[63] *Reply* at 3–4.

[64] *Id*. at 4.

[65] *Opposition* at 9; *Complaint* ¶¶ 5, 10, 17, 19, 49, 76, 77, 93, 95.

As Standard Registrar appears to concede, the case law suggests that transfer agents are proper defendants under Section 17(a).  Its argument that Standard Registrar did not "actively engage[]" in the fraud does nothing to negate this concession.[66]  Instead, it mirrors Standard Registrar's argument that it did not have the requisite mental state to be plausibly liable for fraud under either Section 17(a) or Section 10(b), which the court takes up below.

## II.    Standard Registrar's Corporate Form Does Not Shield It from Clayton's Conduct.

Section 17(a)(1) of the Securities Act prohibits, in the offer or sale of securities, the use, with scienter, of any device, scheme, or artifice to defraud.  The Supreme Court has held that the Commission must establish scienter as an element of a civil enforcement action under § 17(a)(1) of the '33 Act, § 10(b) of the '34 Act, and Rule 10b-5 promulgated thereunder.[67]  In the Tenth Circuit, scienter is defined as either a mental state embracing an intent to deceive, manipulate, or defraud, or recklessness.[68]

The SEC alleges Clayton owns Standard Registrar and that he used his position of ownership and control to direct Standard Registrar to further his scheme.[69]  Standard Registrar does not dispute whether Clayton acted with scienter.  Instead, Standard Registrar argues that Clayton's stock ownership and "on paper" control over it is insufficient to impute his mental state to it.[70]  The SEC, on the other hand, contends "[i]t is well settled that an owner and control

---

[66] *Reply* at 5.

[67] *Aaron*, 446 U.S. at 701–02.

[68] *Indiana Pub. Ret. Sys.* v. *Pluralsight, Inc.*, 45 F.4th 1236, 1258–59 (10th Cir. 2022).

[69] *Opposition* at 9; *Complaint* ¶¶ 5, 10, 17, 19, 49, 76, 77, 93, 95.

[70] *Reply* at 5–6.

person's scienter is imputed to a corporation."[71]  Standard Registrar attacks the authorities the

SEC relies on for this proposition for being out of circuit and for involving conduct that more

clearly demonstrates an owner's control over an entity.[72]  But as the SEC points out, the cases

Standard Registrar relies on "invert the relevant analysis" because they demonstrate that an

individual *employee's* position alone cannot impute scienter to the employer, and that a

subsidiary's scienter is not necessarily imputed to a parent.[73]  Here, Clayton is not an employee

or a subsidiary but rather the "top-down owner and control person."[74]  Standard Registrar bears

the burden on its Motion but it fails to cite authorities suggesting why Clayton's conduct should

not be imputed to Standard Registrar.

In any case, the SEC dos not merely allege Clayton had control "on paper" over Standard

Registrar, and the SEC's allegations about Clayton's control over Standard Registrar are not

conclusory, as Standard Registrar insists.[75]  The SEC specifically alleges Standard Registrar,

"acting solely at the direction of Clayton or Clayton's staff for each Clayton Nominee," issued

Flexpoint shares and removed restrictive legends.[76]  Moreover, Clayton is directly implicated in

Standard Registrar's conduct relevant to this lawsuit through Jackson, a Standard Registrar board

member[77] whose allegedly fraudulent attorney opinion letters greased the wheels of the entire

---

[71] *Opposition* at 9 (citing *SEC v. Graulich*, No. 2-09-cv-04355, 2013 WL 3146862, at *6 (D.N.J. June 19, 2013) (unpublished), *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir. 1975), *SEC v. Duncan*, No. 8-cv-1323, 2009 WL 10670521, at *11 (C.D. Cal. July 6, 2009) (unpublished), and *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 381–82 (S.D.N.Y. 2007)).

[72] *Reply* at 7–8.

[73] *Opposition* at 9–10.

[74] *Id*.; *see also Complaint* ¶¶ 19, 95.

[75] *Reply* at 7–8.

[76] *Complaint* ¶ 5.

[77] *Id*. ¶¶ 10, 20.

scheme.[78]  The SEC specifically alleges Clayton was "aided and abetted" by Jackson in his

scheme to fraudulently sell shares of Flexpoint and ForeverGreen.[79]  Furthermore, the

Commission alleges "[t]hrough at least 2020, Clayton kept Jackson as an attorney on a paid

retainer, but Jackson continued to act at Clayton's behest thereafter.  Jackson provided various

services over a period of years to aid Clayton's fraudulent scheme."[80]  It also alleges "Jackson

shared an office building with Clayton for decades."[81]

Reading the Complaint as a whole, Clayton—the owner of Standard Registrar—was not a

passive investor in transfer agents, one of which happened to be implicated in Clayton's wider

scheme.  Rather, the SEC specifically alleges Clayton used Standard Registrar to effectuate his

scheme, and Standard Registrar's board member and Clayton's close associate is alleged to have

aided and abetted him by causing Standard Registrar to remove restrictive legends on the stock at

issue.  These allegations are supported with substantial factual details outlining the scope of

Clayton's scheme.  Accepting these facts as true as it must at this stage, the court concludes

Clayton plausibly used his control over Standard Registrar to effectuate his scheme.

Accordingly, the fact that Clayton acted with scienter—which Standard Registrar does not

dispute—can be fairly imputed to Standard Registrar, and Standard Registrar is plausibly liable

for fraud under Sections 17(a)(1) and (3) of the Securities Act and under Section 10(b) of the

Exchange Act and Rules 10b-5(a) and (c) thereunder.[82]

---

[78] *Id*. ¶¶ 48–49.

[79] *Id*. ¶¶ 5, 76–77, 93, 102, 105.

[80] *Id*. ¶ 60.

[81] *Id*. ¶ 62.

[82] Because scienter is a higher standard than negligence, establishing that a defendant acted with scienter is sufficient to establish negligence.  *See SEC v. GenAudio Inc.,* 32 F.4th 902*,* 932 (10th Cir. 2022).  Thus, because the court concludes Clayton's scienter can be imputed to Standard Registrar under both Sections 17(a)(1) and 10(b), it follows that, under Section 17(a)(3), which requires the lower mental state of negligence, the SEC also plausibly stated a claim against Standard Registrar.

## CONCLUSION

For the foregoing reasons, Standard Registrar's Motion to Dismiss is DENIED.[83]

SO ORDERED this 16th day of June 2025.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[83] Dkt. 43.