IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JOHN S. CLAYTON, et al.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:24-cv-00918-RJS-DBP<br><br>Chief District Judge Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

Now before the court is Defendant Donald Perry's Motion to Dismiss pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.[1] For the reasons explained below, the court DENIES the Motion.[2]

## BACKGROUND[3]

This case concerns Defendant John Clayton's alleged securities fraud scheme to "secretly amass and then illegally sell stock of small, publicly traded companies."[4] Clayton "hid his stock ownership from investors, brokerage firms, and regulators" by spreading shares among several business entities (the Clayton Nominees) "that he secretly controlled."[5] The SEC alleges Clayton illegally used a transfer agent he owned and controlled to remove restrictive legends on stock owned by the Clayton Nominees, allowing the stock to be deposited in brokerage firms and

---

[1] Dkt. 61, *Defendant Donald Perry's Motion to Dismiss* (*Motion*).

[2] Pursuant to DUCivR 7-1(g), the court finds oral argument is not necessary and decides the Motion on the papers.

[3] The court takes the following facts from Plaintiff Securities and Exchange Commission's Complaint. Dkt. 1, *Complaint*. At the motion to dismiss stage, the court accepts as true SEC's well-pleaded factual allegations and views them in the light most favorable to the SEC. *See, e.g.*, *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005) (citation omitted).

[4] *Complaint* ¶ 1.

[5] *Id*.

then sold in unregistered and unrestricted transactions.[6] Before the Clayton Nominees sold the stock, Clayton artificially inflated prices and trading volume.[7]

The SEC alleges many individuals aided and abetted Clayton's scheme, including Perry.[8] Perry worked for decades as Clayton's bookkeeper.[9] Perry "maintained records of the Clayton Nominees' stock holdings" and "prepared tax returns for Clayton Nominees."[10] The Clayton Nominees' accounts were all managed by Clayton, Perry, and First Equity Holdings,[11] an operating entity through which Clayton managed real estate as well as securities.[12] Relevant here, the SEC alleges Perry "served as the middleman between Clayton and brokerage firms" by "prepar[ing] and deliver[ing] materially false information" to "facilitate the illegal sale of stock."[13]

Clayton's scheme involved stock ownership in microcap companies, which include companies with stock that trades at less than $5.00 per share.[14] These stocks are commonly referred to as "penny stocks."[15] Clayton acquired significant stock holdings in four microcap companies—Flexpoint Sensor Systems, Inc. (Flexpoint), ForeverGreen Worldwide Corp. (ForeverGreen), KwikClick, Inc., and LZG International, Inc. (together, the Clayton Issuers)—and he hid these holdings by acquiring the stock in the name of one or more of the Clayton

---

[6] *Id*. ¶¶ 10, 44–50, 76, 93. A "transfer agent" is a company that "issues and cancels certificates of a company's stock to reflect changes in ownership" and "track[s] whether shares are restricted from resale." *Id*. ¶ 44.

[7] *Id*. ¶¶ 1, 67, 69–70, 76, 86–87, 98, 118–21.

[8] *Id*. ¶¶ 5, 7, 57, 59, 63–64.

[9] *Id*. ¶ 7.

[10] *Id*. ¶ 63.

[11] *Id*. ¶ 57.

[12] *Id*. ¶ 18.

[13] *Id*. ¶¶ 7, 64.

[14] *Id*. ¶ 34.

[15] *Id*.

Nominees.[16]  At all relevant times for the events giving rise to this lawsuit, Clayton was an "affiliate" of each of the Clayton Issuers, meaning that he "directly or indirectly through one or more intermediaries, control[led], [was] controlled by, or [was] under common control with" the Clayton Issuers.[17]

The SEC alleges Clayton often paid employees or friends to act as nominal corporate officers of the Clayton Nominees, but "[t]hese individuals exercised no real control over the Clayton Nominees despite corporate records identifying them as the officers."[18]  One such Clayton Nominee was Empire Fund Managers, Inc. (Empire), and its nominal officer was Perry's wife.[19]  Perry allegedly "arranged for his wife to sign documentation relating to Empire's acquisition and deposit of relevant stock."[20]  In one instance, Perry emailed Clayton asking him to affix a copy of Perry's wife signature to a letter from Empire to a brokerage firm, and Clayton obliged.[21]  The letter "gave Perry and Clayton's assistant authority to trade in Empire's brokerage account and to withdraw trading proceeds."[22]  The SEC alleges "Perry worked with Clayton to forge Perry's wife's signature on documentation relating to a brokerage account."[23]

In 2019, Empire owned 3.65 million shares of Flexpoint,[24] which became unrestricted for sale when Defendant Daniel Jackson (attorney, board member of Clayton's transfer agent

---

[16] *Id.* ¶ 51.

[17] *Id.* ¶ 43

[18] *Id.* ¶ 53.

[19] *Id.* ¶ 57.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.* ¶ 7.

[24] *Id.* ¶ 80.

company, and associate of Clayton)[25] and Defendant Clark Mower (CEO and president of Flexpoint)[26] prepared a fraudulent "paper trail" allowing Clayton's transfer agent company to remove restrictive legends on the Flexpoint stock.[27] Once the legends were removed, "Clayton needed to deposit [the stock] at a brokerage firm to sell it to the public."[28] To facilitate this, Perry delivered Jackson and Mower's paper trail[29] to a brokerage firm and submitted a brokerage deposit form on behalf of Empire.[30] A brokerage deposit form requires the entity depositing stock to make certain representations about the stock under penalty of perjury.[31] Perry's wife signed the brokerage deposit form for Empire "either at Perry's direction or by Clayton or Perry affixing a copy of her signature."[32]

The brokerage deposit form represented to the brokerage firm, among other things, that Empire: 1) was not an "affiliate" of Flexpoint, which was allegedly false because Clayton controlled each entity and was an affiliate of Flexpoint; 2) was not engaged in promotional efforts regarding Flexpoint, which was allegedly false because Clayton was paying for stock promotion services; 3) was not engaged in a plan to violate or evade the registration provisions of the Securities Act or any other federal or state law or regulation, which was allegedly false, because, among other things, Clayton structured this transaction and others to evade registration requirements; 4) did not coordinate with possible sales by other stockholders, which was

---

[25] *Id*. ¶¶ 20, 62.

[26] *Id*. ¶ 22.

[27] *Id*. ¶¶ 6, 8, 72–73, 83.

[28] *Id*. ¶ 84.

[29] This included Jackson's attorney opinion letters on which Clayton's transfer agent relied to remove the restrictive legends and Mower's board resolutions and letters, all of which purported to confirm that the Clayton Nominees were not Flexpoint affiliates. *Id*. ¶¶ 6, 47–49, 83.

[30] *Id* ¶ 84.

[31] *Id*.

[32] *Id*.

allegedly false because Clayton was coordinating sales activity with the other Clayton Nominees; and 5) was not a beneficial owner of more than the number of shares deposited, which was allegedly false because Clayton beneficially held additional Flexpoint stock through the Clayton Nominees.[33] Jackson and Mower's documentation made similar representations.[34] The brokerage firm initially found Jackson's attorney opinion letters to be deficient, so Clayton "directed Perry to further assist in obtaining" corrected documentation from him.[35]

Clayton repeated this scheme on behalf of other Clayton Nominees and with respect to stock from other Clayton Issuers, and Perry's role in depositing stock to the brokerage firms on behalf of the other Clayton Nominees was the same even though Perry's wife was the nominal officer for only Empire.[36]

One Clayton Issuer—LZG International—was maintained by Clayton "as a public, non-operating shell company" that Clayton sought to merge "with an operating microcap company."[37] Clayton "arranged for LZG International to bring [an artificial intelligence company] public by acquiring its assets."[38] The SEC alleges "Clayton used the Clayton Nominees to conceal his ownership of stock in LZG International."[39] Perry allegedly provided Clayton's staff at First Equity Holdings with guidance regarding which Clayton Nominee should be used to hold LZG International stock, advising that "he had reviewed draft tax returns for [several Clayton Nominees] but recommended Investrio, Inc. be used because it "ha[s] the

---

[33] *Id.*

[34] *Id.* ¶¶ 6, 47–49, 83.

[35] *Id.* ¶ 85.

[36] *Id.* ¶¶ 72–105.

[37] *Id.* ¶ 110.

[38] *Id.* ¶¶ 38, 111.

[39] *Id.* ¶ 112.

biggest losses."[40]  The next day, "Clayton directed his bank to 'transfer $610,000 from First Equity's . . . account into Investrio's new account . . . ,'" and then to wire $600,000 to the artificial intelligence company's account from Investrio's account.[41]

The SEC brings two claims against Perry: 1) aiding and abetting violations under Section 17(a) of the Securities Act;[42] and 2) aiding and abetting violations under Section 10(b) of the Exchange Act and Rule 10-b-5.[43]  Now before the court is Perry's Rule 12(b)(6) Motion to Dismiss both claims.  The Motion is fully briefed and ripe for decision.[44]

## LEGAL STANDARD

A motion to dismiss for failure to state a claim tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true.[45]  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[46]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[47]  This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[48]  A complaint need not set forth

---

[40] *Id.*

[41] *Id.*

[42] *Id.* ¶¶ 158–60.

[43] *Id.* ¶¶ 161–63.

[44] *Motion*; Dkt. 66, *Plaintiff Securities and Exchange Commission's Opposition to Donald Perry's Motion to Dismiss* (*Opposition*); Dkt. 70, *Reply in Support of Defendant Donald Perry's Motion to Dismiss* (*Reply*).

[45] Fed. R. Civ. P. 12(b)(6); *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994) (citing *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991)).

[46] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[47] *Iqbal*, 556 U.S. at 678.

[48] *Id.* at 679.

detailed factual allegations, yet "[a] pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action'" is insufficient.[49]

Under the Federal Rules of Civil Procedure there is a heightened pleading requirement for allegations of fraud. Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The Tenth Circuit has held "Rule 9(b) requires only the identification of the circumstances constituting fraud, and that it does not require any particularity in connection with an averment of intent, knowledge or condition of mind."[50] While stating a claim for fraud in the context of private securities litigation requires more particularized details concerning state of mind,[51] SEC claims under § 10(b) and Rule 10b–5 of the Exchange Act and § 17(a) of the Securities Act "need only allege scienter generally."[52]

## ANALYSIS

To state a claim for aiding and abetting against Perry, the Commission must demonstrate "(1) that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary 'scienter'—i.e., that the aider and abettor rendered such assistance knowingly or recklessly."[53] Furthermore, "claims seeking to impose aiding and abetting liability under securities laws must likewise satisfy Rule 9(b), and may not be based on routine participation in certain

---

[49] *Id.* at 678 (quoting *Bell Atl. Corp.*, 550 U.S. at 555).

[50] *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1252 (10th Cir.1997).

[51] *See* 15 U.S.C § 78u-4(2) (Private Securities Litigation Reform Act of 1995); *see also In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1292 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir. 2015).

[52] *SEC v. Gordon*, No. 09-cv-0061-CVE-FHM, 2009 WL 1652464, at *4 (N.D. Okla. June 11, 2009).

[53] *SEC. v. Autocorp Equities, Inc.*, 292 F. Supp. 2d 1310, 1331 (D. Utah 2003) (citing *Graham v. SEC,* 222 F.3d 994, 1000 (D.C.Cir.2000)).

transactions."[54] Perry does not appear to contest that Clayton committed a primary violation of securities fraud or that Perry provided substantial assistance to Clayton. Instead, Perry takes aim at whether the SEC has satisfied Rule 9(b) and whether it has adequately pled he acted with scienter. He contends the SEC's allegations against him are insufficient in both respects.[55] The SEC, on the other hand, contends it pled particularized allegations against Perry and demonstrated Perry was at least reckless with respect to the assistance he rendered to Clayton, which the Commission argues is sufficient to state its aiding and abetting claims against Perry.[56]

The court agrees with the Commission. The SEC pled the circumstances of Perry's involvement in Clayton's scheme with sufficient particularity to "afford [Perry] fair notice of [the SEC's] claims and the factual ground upon which they are based."[57] And viewing the Complaint as a whole, the court can fairly infer at this stage that Perry's mental state—which need not be pled with particularity—was at least reckless as to the services he rendered in furtherance of Clayton's scheme.

## I. The SEC Adequately Pled the Circumstances Concerning Perry's Role in Clayton's Scheme with Particularity.

Perry understates the Commission's particularized allegations concerning his participation in Clayton's scheme. Perry's alleged role in the scheme is outlined with particularity: the SEC alleges Perry was the "middleman" between the Clayton Nominees, who nominally owned the penny stocks, and the brokerage firms, who enabled the Clayton Nominees

---

[54] *Wichita Fed. Sav. & Loan Ass'n v. Landmark Grp., Inc.*, 657 F. Supp. 1182, 1187 (D. Kan. 1987) (citing *Seattle-First Nat. Bank v. Carlstedt*, 800 F.2d 1008 at 1011 n.2 (10th Cir. 1986)).

[55] *Motion* at 2, 4–5.

[56] *Opposition* at 9–11.

[57] *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000).

to sell their stocks to the public.[58] The SEC alleges Perry participated in forgeries relating to brokerage accounts to facilitate stock deposits and that Perry aided Clayton in propping up nominal officers for the Clayton Nominees—one of whom was his wife—by functionally managing all of the Clayton Nominees.[59] Moreover, as the "middleman" between the Clayton Nominees and the brokerage firms, Perry was tasked with supplying fraudulent representations to the firms and producing corrected documentation when a brokerage firm rejected a deposit.[60] The SEC explains that this was Perry's role with respect to all of the Clayton Nominees for multiple fraudulent deposits—and not only for the entity nominally managed by his wife.[61] In other words, although Perry did not sign the brokerage deposit forms, the SEC alleges he managed the entities whose nominal representatives did sign them.[62] These allegations plainly "set forth the who, what, when, where and how" of Perry's participation in Clayton's scheme.[63]

Perry also contends the Complaint is deficient because it "generally" shows only that "Perry assisted Clayton in delivering false information and reports without specifically identifying the false information delivered, or the parties to whom it was delivered, or the time or circumstances when they were delivered, or how that perpetrated the fraud."[64] But the Complaint does identify all this information. The SEC precisely details what information Perry supplied to the brokerage firms when attempting to deposit Clayton Nominee stock: false

---

[58] *Complaint* ¶¶ 64, 84.

[59] *Id*. ¶¶ 7, 57, 102.

[60] *Id*. ¶¶ 64, 84–85.

[61] *Id*. ¶ 102.

[62] *Id*. ¶ 102.

[63] *TDC Lending LLC v. Private Capital Group, Inc.*, 340 F. Supp. 3d 1218, 1224 (D. Utah Sept. 13, 2018) (internal citations omitted).

[64] *Motion* at 5 (citing *TDC Lending LLC*, 340 F. Supp. 3d at 1224).

attestations concerning the relationship between the Clayton Nominees and the Clayton Issuers.[65] The Complaint similarly makes clear which stock deposits were based on these false attestations and when they occurred.[66] And the Complaint also articulates the role of the stock deposits at brokerage firms in Clayton's overall scheme: it facilitated the Clayton Nominees' sale of stock to the public.[67] Accordingly, the Complaint "afford[s] [Perry] fair notice of [the SEC's] claims and the factual ground upon which they are based," and so the SEC adequately pled the circumstances giving rise to its claims against Perry under Rule 9(b).[68]

## II. The SEC Adequately Pled Perry Acted with Scienter.

While Rule 9(b) requires the Plaintiff to "set forth the who, what, when, where and how" of the alleged fraud,[69] it "does not require any particularity in connection with an averment of intent, knowledge or condition of mind."[70] Accordingly, claims brought by the SEC under § 10(b) and Rule 10b–5 of the Exchange Act and § 17(a) of the Securities Act "need only allege scienter generally."[71] And a defendant accused of aiding and abetting securities fraud acts with scienter if he or she "render[s] such assistance knowingly or recklessly."[72]

Perry contends the SEC's claims against him should be dismissed because the Complaint "fails to adequately plead Mr. Perry's knowledge and awareness of the alleged scheme."[73] Perry

---

[65] *Complaint* ¶¶ 64, 84.

[66] *Id.* ¶¶ 72–105 (detailing that Clayton employed this scheme with Perry's involvement for Flexpoint stock in July 2019 and in January 2021 and for ForeverGreen stock in "multiple rounds" of sales since 2014).

[67] *Id.* ¶¶ 84–85, 102.

[68] *Koch*, 203 F.3d at 1236. The court need not opine on the parties' dispute about a potentially "relaxed" Rule 9(b) standard applicable to securities fraud cases based on market manipulation because the court finds that the SEC satisfies the Rule 9(b) standard as set forth by Perry's Motion. *See Motion* at 3 (citing *Koch*, 203 F.3d at 1236).

[69] *TDC Lending LLC*, 340 F. Supp. 3d at 1224.

[70] *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997).

[71] *Gordon*, 2009 WL 1652464, at *4.

[72] *Autocorp Equities, Inc.*, 292 F. Supp. 2d at 1331.

[73] *Motion* at 5.

adds that the court should not infer scienter on account Perry's role as bookkeeper for Clayton[74] nor based on the SEC's allegation that he "worked with Clayton" to forge Perry's wife's signature because that allegation is not pleaded with particularity and is conclusory.[75] With respect to his role in affixing his wife's signature on documents, Perry contends the appropriate "inference" to be drawn from the Complaint is that he had permission to sign on her behalf.[76]

      Perry misapprehends the relevant standards for a Plaintiff demonstrating scienter in this context. At the Rule 12 stage, scienter may be pled generally,[77] recklessness falls under the umbrella of scienter,[78] and all factual allegations are construed in "in a light most favorable to the plaintiff" with "all reasonable inferences" drawn in the plaintiff's favor.[79] Moreover, as the SEC points out, some courts are willing to infer the third element of an aiding and abetting claim, scienter, where the second element, substantial assistance, is strongly supported.[80] Here, Perry nowhere specifically denies that his actions rise to the level of substantial assistance; rather, he contends only that his alleged conduct was not described with particularity and does not show scienter.[81] But at bottom, Perry never explains why the SEC 's general allegation of scienter—that "Perry knowingly or recklessly delivered false deposit forms, many purportedly

---

[74] *Id*. at 5–6.

[75] *Id*. at 6; *Reply* at 7.

[76] *Reply* at 7.

[77] *Gordon*, 2009 WL 1652464, at *4.

[78] *Autocorp Equities, Inc.*, 292 F. Supp. 2d at 1331.

[79] *See, e.g.*, *Seamons v. Snow*, 84 F.3d 1226, 1232 (10th Cir. 1996).

[80] *SEC v. Apuzzo*, 689 F.3d 204, 215 (2d Cir. 2012) (finding "a high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving scienter."); *see also Twitter, Inc. v. Taamneh*, 598 U.S. 471, 491–92 (2023) (finding the same for a common law aiding and abetting claim).

[81] *See generally*, *Motion* and *Reply*.

signed by Perry's wife, concerning the Clayton Nominees and the stock to be deposited"—is insufficient.[82]

Nevertheless, Perry contends the SEC's allegations against him are consistent with his role as a bookkeeper, which in his view do not demonstrate "an extreme departure from ordinary care."[83] But the SEC does not merely allege Perry's "routine participation" in certain transactions.[84] Perry allegedly forged signatures,[85] used his spouse as a nominal officer for an entity implicated in a securities fraud scheme for which he exercised management duties,[86] and was tasked with correcting fraudulent attorney opinion letters rejected by brokerage firms.[87]

Perry's request that the court discount the SEC's allegation that he forged his wife's signature because it is not pled with particularity,[88] is conclusory,[89] and the Complaint as a whole gives rise to a reasonable inference that Perry had his wife's permission to affix her signature to the relevant documents,[90] is similarly unavailing. As already mentioned, none of these justifications are compelling given the standards and burdens governing Perry's Motion. Scienter need not be pled with particularity.[91] Moreover, the SEC's allegation that Perry "worked with" Clayton to forge his wife's signature on documents relating to brokerage firm deposits is not conclusory; it is not a "threadbare recital[]"[92] of an element of an aiding and

---

[82] *Complaint* ¶ 64.

[83] *Reply* at 6–7.

[84] *Landmark Grp., Inc.*, 657 F. Supp. at 1187.

[85] *Complaint* ¶ 7.

[86] *Id.* ¶¶ 64, 84.

[87] *Id.* ¶ 85.

[88] *Reply* at 7.

[89] *Motion* at 6.

[90] *Reply* at 7.

[91] *Gordon*, 2009 WL 1652464, at *4.

[92] *Iqbal*, 556 U.S. at 663.

abetting claim and it is otherwise supported by factual allegations concerning Perry's role in Clayton's scheme.[93]  And the inference Perry asks this court to make—that Perry's wife authorized Clayton and Perry to use her signature—flips the relevant standards and burdens under Rule 12.  The court is required at this stage to view the Complaint in the light most favorable to the SEC, not to Perry.  Perry is correct that the SEC equivocates as to whether Perry or Clayton was ultimately responsible for affixing Perry's wife's signature to the brokerage deposit forms in one instance related to Empire's deposit of Flexpoint stock in 2019.[94]  But viewing the Complaint as a whole, the SEC elsewhere alleges Perry forged his wife's signature on documentation "relating to a brokerage account"[95] and that Perry reached out to Clayton to ask him to affix Perry's wife's signature on a letter giving Perry authority to trade in Empire's brokerage account.[96]  Construing the Complaint in the light most favorable to the SEC, as the court must, the court finds it is reasonable to conclude that Perry affixed his wife's signature to effectuate certain deposits of stock to brokerage firms without her knowledge or authorization.

But even if the court were to discount the SEC's allegation that Perry forged his wife's signature as part of this scheme—which would be highly probative of Perry's knowing participation in Clayton's scheme—other facts also give rise to an inference that Perry acted at least recklessly.  The Complaint alleges Perry had robust knowledge about and control over the Clayton Nominees.[97]  Perry objects to the SEC's characterization that he had a "global view" and "broader visibility" of the Clayton Nominees' finances because those characterizations are

---

[93] *Complaint* ¶¶ 57, 63–64, 84–85, 102.

[94] *Id.* ¶ 84.

[95] *Id.* ¶ 7.

[96] *Id.* ¶ 57.

[97] *Id.* ¶¶ 57, 63–64, 84–85, 102.

extraneous to the Complaint.[98]  But this is not so.  The SEC demonstrates Perry's "global view" of Clayton's affairs, for example, in its allegations concerning Perry's conduct regarding Clayton's acquisition of LZG International stock.[99]  Perry recommended to Clayton's staff which Clayton Nominee should purchase LZG International stock, and he did so based on his understanding of the financial positions of all of the Clayton Nominees.[100]  One day later, Clayton's staff heeded Perry's recommendation.[101]  Given Perry's alleged management of the Clayton Nominees,[102] and his ostensible understanding of their financial positions,[103] it is reasonable for the court to infer that Perry knew the documentation he provided to brokerage firms was fraudulent, or at least that he was reckless in providing such documentation.[104]

Additionally, when the brokerage firm initially found Jackson's documentation to be deficient, Clayton "directed Perry to further assist in obtaining" corrected documentation from Jackson.[105]  Even accepting that Perry was not involved in the *signing* of brokerage deposit forms that he ultimately supplied to brokerage firms, he was evidently responsible for seeking out attorney opinion letters from Jackson, letters for which he was on notice from the brokerage firms as being deficient.  This, combined with Perry's understanding and management of the Clayton Nominees and the fact that his wife was enlisted as a nominal officer for one such

---

[98] *Reply* at 3 (citing *Opposition* at 4–5).

[99] *Complaint* ¶¶ 110–112.

[100] *Id*. ¶ 112.

[101] *Id*.

[102] *Id*. ¶ 57.

[103] *Id*. ¶ 112.

[104] *See SEC v. Hughes Cap. Corp.*, 124 F.3d 449, 452–54 (3d Cir. 1997) (affirming summary judgment against a "bookkeeper" where he ignored obvious indicia of fraud in stock transactions using "nominee" accounts).

[105] *Complaint* ¶ 85.

Nominee, suggests that he was at least reckless in delivering fraudulent representations to brokerage firms on the Clayton Nominees' behalf.

In any case, the SEC generally alleges that Perry "knowingly or recklessly" provided false documentation to brokerage firms,[106] and Perry does not explain why that allegation is insufficient for pleading scienter at the Rule 12 stage. Perry nowhere grapples with the fact that scienter may be inferred where there is strong evidence of substantial assistance, nor does he deny that his conduct constituted substantial assistance. He never meaningfully engages with the relevant definitions of scienter, which include recklessness. And he flips the relevant Rule 12 burden by asking the court to infer facts favorable to him concerning his alleged participation in forging documents. Because of these failings, the court finds it can reasonably infer that Perry at least acted recklessly in aiding and abetting Perry's scheme.

## CONCLUSION

For the foregoing reasons, Perry's Motion to Dismiss is DENIED.[107]

SO ORDERED this 16th day of June 2025.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[106] *Id.* ¶ 64.

[107] Dkt. 61.